# In the United States Court of Federal Claims

**BID PROTEST**

No. 11-446 C

(Filed Under Seal: October 14, 2011)

(Reissued for Publication:  October 28, 2011)[*]

BID PROTEST

TO BE PUBLISHED

|  |  |
|---|---|
| D&S CONSULTANTS, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>THE UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>CACI-ISS, INC., )<br><br>and )<br><br>HP ENTERPRISE SERVICES, LLC, )<br><br>Defendant-Intervenors. ) | Post-award bid protest; exclusion from final competitive range; agency concerns re "unrealistically low labor rates" and allocation of labor hours; price realism analysis concludes very high degree of risk for recruiting and retaining an adequate workforce and for understanding problems involved in meeting contractual requirements; independent government cost estimate; contemporaneous record re development and application of same; post-hoc rationalization v. clarification of prior agency action; consideration of agency statements made during GAO protest; "agency record" as defined by 31 U.S.C. § 3556; "core documents," including those identified in RCFC, Appendix C, paragraph 22(u); items for negotiation; meaningful and equal discussions with all offerors within the initial competitive range; FAR 15.306(d)(3); FAR 15.306(e)(1); agency did not rely upon new, unstated determinative criterion in evaluating plaintiff's proposal |

Anthony H. Anikeeff, William A. Wozniak, Williams Mullen, PC, McLean, Va., for plaintiff.   R. James Kravitz, Fox Rothschild LLP, Lawrenceville, N.J., of counsel.

---

[*] This Opinion and Order was originally filed under seal on October 14, 2011 (docket entry 84) pursuant to the protective order entered on August 5, 2011 (docket entry 22).  The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted under the terms of the protective order.  The parties filed a joint status report requesting certain redactions on October 26, 2011 (docket entry 88).  The Court has reviewed the parties' proposed redactions and concluded that they are appropriate.  Accordingly, the Court is reissuing its Opinion and Order dated October 14, 2011, with redactions indicated by three consecutive asterisks within brackets.

Christopher L. Krafchek, Trial Attorney, Anuj Vohra, Trial Attorney, Kirk T. Manhardt, Assistant Director, Jeanne E. Davidson, Director, Civil Division, Commercial Litigation Branch, Tony West, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  Robert Russo, Staff Attorney, Desiree DiCorcia, Staff Attorney, Colin Nash, Staff Attorney, Department of Veterans Affairs, Eatontown, N.J., of counsel.

Claude P. Goddard, Daniel J. Donohue, Sarah M. Graves, Husch Blackwell LLP, Washington, D.C., for defendant-intervenor CACI-ISS, Inc.

Richard J. Conway, Michael J. Slattery, Pablo A. Nichols, Dickstein Shapiro LLP, Washington, D.C., for defendant-intervenor HP Enterprise Services, LLC.

## OPINION AND ORDER

<u>GEORGE W. MILLER</u>, Judge

Plaintiff D&S Consultants, Inc. ("D&S" or "DSCI") filed a complaint against the United States alleging that the Department of Veterans Affairs ("DVA") improperly evaluated the proposal submitted by plaintiff in response to DVA's Request for Proposals ("RFP" or "Solicitation"), No. VA-118-10-RP-0052, and in so doing acted in a manner that was arbitrary, capricious, an abuse of discretion, and in violation of the Federal Acquisition Regulations ("FAR") and its own Solicitation.  Am. Compl. (docket entry 12, July 18, 2011); *see also* Pl.'s Mot. for J. on Administrative R. (docket entry 44, Aug. 23, 2011); Def.'s Mot. for J. on Administrative R. (docket entry 47, Aug. 24, 2011).  For the reasons set forth below, the Court **DENIES** plaintiff's motion for judgment on the administrative record and **GRANTS** defendant's motion for judgment on the administrative record.

## I.     Background

Plaintiff is an Eatontown, New Jersey-based corporation that was founded in 1992.  Am. Compl. ¶ 3.  It has a history of "serv[ing] a range of Federal Government and commercial customers by furnishing them with an array of high-technology products and services."  *Id.*; *see also* Administrative Record ("AR") Tab 13, at 15802 (docket entry 23, Aug. 5, 2011).  In August 2010, plaintiff submitted a proposal in response to the Solicitation.  It now challenges DVA's decision to exclude it from the final competitive range.

### A.     DVA's Solicitation for the T4 Program

On July 26, 2010, DVA issued an RFP for its Transformation Twenty-One Total Technology ("T4") Program.  AR Tab 3.  The RFP sought proposals regarding "a total IT services solution encompassing, but not limited to software and IT products incidental to the solution, in conjunction with all services needed to integrate a system, network, or other IT service in order to meet [DVA's] mission requirements."  AR Tab 3, at 163.  The Performance Work Statement ("PWS") described general requirements of the contract.  *Id.*  More specific requirements were to be defined in individual task orders to be issued during the pendency of the contract.  *See id.*

The agency anticipated entering into an Indefinite Delivery/Indefinite Quantity, Multiple Award Task Order contract with a five-year period of performance.  AR Tab 3, at 164.  The RFP provided for a maximum selection of fifteen awardees, with at least four contracts being awarded to Service-Disabled Veteran-Owned Small Businesses ("SDVOSB") and at least three being awarded to Veteran-Owned Small Businesses ("VOSB").  AR Tab 3, at 250.  The ceiling value of the T4 Program was $12 billion, with a minimum $50,000 guaranteed to each awardee.  AR Tab 3, at 158.

The Solicitation explained that "[a]ny awards to be made will be based on the best overall (i.e., best value) proposals that are determined to be the most beneficial to the Government."  AR Tab 3, at 250.  To evaluate the proposals under this standard, the RFP set forth five criteria: (1) technical, consisting of two sub-factors: (a) sample tasks and (b) management; (2) past performance; (3) veterans involvement; (4) small business participation commitment ("SBPC"); and (5) price.  AR Tab 3, at 250–51.  With regard to the weight to be assigned to each criterion, the Solicitation provided that "[t]he Technical factor is significantly more important than the Past Performance factor, which is slightly more important than the Veterans Involvement factor, which is of equal importance to the SBPC factor, which is slightly more important than the Price factor."  AR Tab 3, at 250.  Additionally, when combined, criteria one through four were viewed as "significantly more important" than criterion five.[1]  *Id.*

        1.      Technical Criterion

To be considered for an award, the Solicitation provided that an offeror's proposal was required to receive a rating of "acceptable"[2] for the technical factor and both technical sub-factors.  *Id.*  The RFP described the two technical sub-factors that were to be assessed when evaluating proposals.  *See* AR Tab 3, at 251–52.  Under the sample tasks sub-factor, offerors were to propose solutions to each of three sample tasks designed to be similar to task orders that would be issued under the contract.  *See* AR Tab 3, at 251.  The offeror's proposed solutions to the sample tasks were evaluated by assessing the offeror's understanding of the problem and the feasibility of its approach.  *See* AR Tab 3, at 251–52.

The second sub-factor, management, was to be similarly evaluated, *see* AR Tab 3, at 252, to determine the offeror's understanding of problems and the feasibility of the offeror's proposed approach.  *See id.*  Under this evaluative standard, DVA sought to determine "whether the offeror's management techniques and controls and team [would] meet the [PWS] requirements and whether the proposal provide[d] the Government with a high level of confidence of successful performance."  *Id.*  Significantly, the Solicitation provided:

        The Government may evaluate the offeror's proposed labor rates to determine if
        the proposed rates are unrealistically low in order to assess the ability of the

---

[1] The RFP specifically cautioned that "awards may not necessarily be made based upon the lowest prices offered."  AR Tab 3, at 250.

[2] The Court has omitted original capitalization in quotes from the administrative record regarding ratings for the various factors and sub-factors.

offeror to meet the PWS requirements and whether the proposal provides the
Government with a high level of confidence of successful performance.
Unrealistically low labor rates may indicate a high-risk approach to contract
performance.

*Id.*

The RFP explained that the proposed labor rates were binding and that DVA's
evaluation of the offeror's proposed labor rates was not to affect its assessment of the
offeror's separate price proposal.  *Id.*  However, if discussions were conducted with the
offeror and its labor rates were subsequently adjusted because of those discussions, DVA
could consider the revised labor rates under the price criterion.  *Id.*  The RFP stated that
such consideration would be "for the limited purpose of aiding the agency in measuring
the risk of the offeror's approach to meeting the PWS requirements."  *Id.*

### 2.  Past Performance Criterion

DVA also used past performance as a factor in assessing the desirability of the proposals.
This evaluative factor looked at "the relative risks associated with an offeror's likelihood of
success in performing the solicitation's requirements as indicated by that offeror's record of past
performance."  *Id.*  The assessment was conducted by looking at "the quality, relevancy[,] and
recency" of the offeror's and its major subcontractors' past performances in the government
contract arena.  *Id.*  The Solicitation specifically identified as significant to its analysis past
contracts greater than $100,000 for the provision of services similar to those to be provided
pursuant to the T4 Program.  AR Tab 3, at 252–53.  A "Past Performance Assessment
Questionnaire" was attached to the Solicitation for offerors to employ when reporting past
performance information.  *See* AR Tab 3, at 258.

### 3.  Veterans Involvement and SBPC Criteria

Under the veterans involvement criterion, evaluation credit was assigned to "an offeror
(prime contractor) which [wa]s a[n SDVOSB] or a [VOSB]."  AR Tab 3, at 253.  Offerors that
were not such entities could receive evaluation credit  if they "agree[d] to subcontract 10% or
more of the contract value to SDVOSB concerns or 12% or more of the contract value to VOSB
concerns."  *Id.*

To be considered for an award, the Solicitation provided that an offeror's proposal was
required to receive a rating of "acceptable" for the SBPC factor.  AR Tab 3, at 250.  In
determining this rating, offerors were to be evaluated based "on the level of small business
commitment that they demonstrate[d] . . . and their prior level of commitment to utilizing small
businesses in performance of prior contracts."  AR Tab 3, at 253.  Specifically, in its analysis the
agency assessed, *inter alia*, "[t]he extent to which such firms . . . [were] specifically identified in
proposals," "[t]he extent of commitment to use such firms," and "[t]he realism of the proposal."
*Id.*  Additionally, the agency considered "[t]he extent to which the offeror [met] or exceed[ed]
the Government's subcontracting goals."  AR Tab 3, at 254.  These goals included assigning five
percent of the total contract value to Small Disadvantaged Businesses, three percent to

Historically Underutilized Business Zone ("HUB Zone") Small Businesses, and five percent to Women-Owned Small Businesses.  *Id.*

4.   Price Criterion

The final evaluative factor in the agency's analysis of proposals was price.  *See* AR Tab 3, at 250.  As discussed, price was the least weighty factor and was far surpassed in importance by the combination of the other four factors.  *Id.*  The RFP specified that the total contract price was the total labor price (consisting of the labor rates contained in the proposals multiplied by labor hours), travel costs, and other direct costs[3] for the five-year period.  AR Tab 3, at 254.  The Solicitation instructed an offeror and its subcontractors to provide "fully loaded labor rates for separately priced On-Site, Off-Site, and OCONUS [("Outside of the Contiguous United States")] work locations for each of the five base years of the contract."  *Id.*  Each fully loaded labor rate[4] was then multiplied by the appropriate level of labor hours over the five-year period.  *Id.*  Other applicable costs were then added to create the total price of the contract if awarded.  *Id.*  The RFP informed potential offerors that "[t]he estimated labor hours . . . [were] for evaluation purposes only and [did] not obligate the Government to award such labor hours."  *Id.*  Finally, with respect to price, the Solicitation mandated that the offeror "ensure that the rates proposed for all of the labor categories subject to the Service Contract Act (SCA) comply with the minimums specified by the applicable Department of Labor Wage Determination."  *Id.*

The Solicitation provided a spreadsheet for use by offerors in displaying the number of work hours anticipated for each of the 167 labor categories involved in the performance of the contract.  *See* AR Tab 3, at 384–96.  Offerors were instructed to show how many hours the prime contractor and each subcontractor would contribute to the total number of hours required, the relative percentage of each in relation to the total number of hours for that labor category, the loaded rate for that category under the prime contractor and subcontractor columns, and the resultant cost of each contractor (prime or sub) in each labor category.  *Id.*

B.   *Instructions Regarding Proposal Submissions*

In addition to setting forth detailed evaluation criteria, the Solicitation contained a section—section L—that outlined instructions and conditions applicable to prospective offerors.  *See* AR Tab 3, at 233–49.  Section L required that proposals be submitted in six separate volumes, each volume containing a specified portion of the proposal, and provided detailed formatting instructions.  *See id.*

---

[3] Other direct costs can include "incidental services for which there is not a labor category specified in the contract."  FAR 16.601(a).

[4] Included in a loaded labor rate were "salary/wages (base rate) plus labor overhead (including fringe benefits), general and administrative expenses, and profit/fee."  Def.'s Mot. for J. on  AR 4.  Essentially, "[a] loaded labor rate would be how much a company charges the Government per hour for an employee's work."  *Id.*

The first volume of the proposal was to contain information related to the technical criterion as described above.  In this volume, the offeror was to include its assessment of "each of three Sample Tasks found in [s]ection J of the RFP."  AR Tab 3, at 239.  With respect to the sub-factor of management, the offeror was instructed to address (1) "Techniques and Controls" and (2) "Contractor/Subcontractor Core Competency."  AR Tab 3, at 239–40.  Under techniques and controls, the offeror was instructed to discuss, *inter alia*, its approaches to ensuring proper and timely execution of delivery orders, addressing problems that may be encountered, and assigning work among the prime and any subcontractors.  *Id.*  With regard to the last approach, the offeror was to include an "an Excel spreadsheet . . . of how the effort required by the T4 PWS w[ould] be assigned for performance within the offeror's corporate entity and among the proposed subcontractors."  *Id.*  Specifically, the offeror was instructed to show "[t]he percentage of work based on hours to be accomplished by the prime and proposed subcontractors and the type of work to be performed by each corporate entity."  AR Tab 3, at 240.  The "type of work" was defined in terms of the technical functional areas of the T4 Program as set forth in the PWS. *See id.*

In its instructions regarding the price volume (volume five), section L required offerors to "provide the loaded labor rates, and allocate the number of labor hours for the prime and each subcontractor, for each year of the five year ordering period."  AR Tab 3, at 247.  Section L also stated: "The apportionment of hours should reflect a realistic assessment of each team member's expected participation/contribution to the effort."  *Id.*  Offerors were specifically "cautioned to ensure that the allocation of work among the prime contractor and the subcontractors indicated in the Price proposal correspond[ed] to the distribution of work indicated in the Management proposal."  *Id.*

C.      *Plaintiff's Response to the Solicitation*

In response to DVA's Solicitation, plaintiff submitted a timely proposal on August 31, 2010.  *See* AR Tab 13.  The proposal listed approximately [***] subcontractors, [***] of which ([***] percent) were classified as SDVOSBs and [***] of which ([***] percent) were classified as VOSBs.[5]  AR Tab 13, at 16184–97.  Plaintiff completed the spreadsheet listing the 167 labor categories.  *See* AR Tab 13, at 14575–15800.  Plaintiff provided the number of hours it and each subcontractor would spend in executing the required tasks.  *Id.*  Plaintiff also employed the SCA to aid in its determination of appropriate wages, AR Tab 13, at 14564–66, as required by the RFP.  AR Tab 3, at 203.  With this data, plaintiff calculated the cost of each subcontractor's labor.  AR Tab 13, at 14575–15800.  To ensure accuracy, plaintiff "required each proposed subcontractor on Team [D&S] to execute a binding teaming agreement and make a firm pricing commitment."  Am. Compl. ¶ 38.  The hours and rates resulting from these agreements and commitments were set forth in the spreadsheet.

With regard to the technical criterion, plaintiff submitted a thirty-five page description of its management strategy in volume 1, subfactor B, of its proposal.  AR Tab 13, at 15801–36.

---

[5] Approximately [***] subcontractors were classified as small businesses, [***] as small disadvantaged businesses, [***] as women-owned small businesses, and [***] as HUB Zone small businesses.  *See* AR Tab 13, at 16184–97.

Under the heading "Techniques and Controls," the proposal discussed plaintiff's management approach and detailed the contractor's organizational structure, including its subcontractors. *See* AR Tab 13, at 15804. Additionally, plaintiff described its Contract Management System, which "[***]," AR Tab 13, at 15807, and its Quality Management System, which aids in [***]. AR Tab 13, at 15811. The proposal described plaintiff's staffing and retention program, which concluded that the team of contractors assembled for the proposal had an average retention rate of [***] percent. AR Tab 13, at 15821–22. Plaintiff also provided a table detailing which technical functional areas plaintiff and each subcontractor were equipped to handle and what employment benefits were available to the employees of both the prime and subcontractors. *See* AR Tab 13, at 15822–26.

D.     *Initial Evaluation of Proposals*

DVA received 107 proposals in response to its T4 RFP. AR Tabs 27–133. It reviewed each proposal to determine whether the loaded labor rates the offeror provided in the labor categories spreadsheet were "unrealistically low," a characteristic that would indicate risk with regard to successful contract performance. AR Tab 208, at 79289. To determine if an offeror's rates were "unrealistically low," DVA compared the rates in the proposals to the rates set forth in an Independent Government Cost Estimate ("IGCE"). AR Tab 208, at 79288–89; *see also* AR Tab 1.

The IGCE was a 105-page document consisting mostly of tables of labor categories, rates, and hours. *See* AR Tab 1. The labor categories were created "based on a review of the full PWS." AR Tab 1, at 2. Labor rates used in the IGCE were said to have been developed using "the simple average of a random sampling of 10 contractors' GSA Schedule 70 Government Site rates, which were discounted by 20% to simulate competition." AR Tab 1, at 2–3. Of the ten selected contractors, seven were large businesses and three were small businesses. *Id.* Not every labor category, however, was represented in the selected contractors' GSA Schedule 70 site rates. *Id.* To account for the unrepresented labor categories, DVA used its "judgment" to find the "best fit" for such labor categories. *Id.* In this process, DVA divided the 167 labor categories utilized in calculating the IGCE into "functional" categories and then reviewed the records of the contractors in the sample to find "an equivalent or closely equivalent labor category under the appropriate functional category." AR Tab 223, at 82161.

Once it evaluated all proposals by reference to the IGCE, DVA established an initial competitive range of offerors in accordance with its Source Selection Evaluation Plan. AR Tab 135, at 41429–31; *see* AR Tab 2, at 131. The competitive range at this point consisted of twenty-two offerors and included plaintiff (designated as offeror number twenty-seven). AR Tab 135, at 41430–31. The notification letter stated that discussions were to be conducted with all offerors in the initial competitive range. AR Tab 135, at 41431.

DVA then released Items for Negotiation ("IFN") to each of the twenty-two offerors in the initial competitive range. *See* AR Tabs 136–57. DVA issued seven IFNs to plaintiff. *See* AR Tab 144. One of the seven IFNs informed plaintiff that it had "proposed unrealistically low labor rates for a substantial quantity of the total labor hours proposed," which, according to DVA, "present[ed] a very high degree of risk for attracting and retaining the workforce required

7

to perform all functional areas of the PWS." AR Tab 144, at 41808. A worksheet was attached to the IFN that displayed the labor rates that DVA regarded as "unrealistically low." AR Tab 144, at 41766–807. Plaintiff was instructed to respond to the IFN and describe its plan for alleviating the risk associated with its proposed labor rates. AR Tab 144, at 41808. Notably, because DVA rated plaintiff's labor rates as a "deficiency," plaintiff's failure to respond would eliminate it from consideration for the contract.[6] *Id.*

On February 25, 2011, plaintiff submitted its responses to DVA's IFNs. *See* AR Tab 167. In response to the deficiency rating relating to its labor rates, plaintiff cited its [***]. AR Tab 167, at 60778–825. Additionally, plaintiff discussed its [***] as a positive contributor to its recruitment and retention capabilities. *Id.*

Plaintiff also reported that it reviewed the worksheet DVA attached to its IFN that highlighted problematic labor rates. AR Tab 167, at 60779. Upon review, plaintiff noted that "[***]." *Id.* It corrected these and provided updated figures. *Id.*; *see* AR Tab 167, at 60781–86. Moreover, plaintiff represented that "[***]." AR Tab 167, at 60779. Overall, plaintiff emphasized its [***], its [***], and its [***] in responding to DVA's concerns about unrealistically low labor rates and plaintiff's allocation of hours.

E.      *Interim Evaluation Reports and Debriefing*

On March 14, 2011, DVA completed its Interim Evaluation Reports for all offerors then in the competitive range. *See* AR Tabs 181–202. The agency's report regarding plaintiff indicated a "low risk" rating for the past performance factor, AR Tab 189, at 78513, and an "[***]" rating for the SBPC factor. AR Tab 189, at 78517. It assigned plaintiff "[***]" for the veterans involvement factor.[7] AR Tab 189, at 78541. With regard to the technical factor, plaintiff received a rating of "[***]." AR Tab 189, at 78519. This rating reflected the combination of a "[***]" rating in the sample tasks sub-factor and an "[***]" rating in the management sub-factor. *Id.*

Under the sample tasks sub-factor, plaintiff's response to each of three sample tasks was assessed with regard to plaintiff's understanding of the problems and the feasibility of its proposed approach. AR Tab 189, at 78522. Plaintiff's responses to the first and second sample tasks received a rating of "[***]," and its response to the third sample task received a rating of

---

[6] Pursuant to the Source Selection Evaluation Plan, a deficiency referred to "[a] material failure of a proposal to meet a Government requirement, or a combination of significant weaknesses in a proposal that increase[d] the risk of unsuccessful contract performance to an unacceptable level." AR Tab 2, at 133. Additionally, aspects of a proposal could be adjudged a strength or a weakness. *See id.* "Strength" was warranted when a portion of the proposal enhanced its merit or increased the probability of success. *Id.* "Weakness" meant that a certain part of the proposal "increase[d] the risk of unsuccessful contract performance." *Id.*

[7] The veterans involvement factor partially overlapped with the SBPC factor, which also considered veterans involvement along with other sub-factors.

"[***]."  AR Tab 189, at 78523.  These contributed to an overall rating of "[***]" for the sample tasks sub-factor.  AR Tab 189, at 78519.

Under the management sub-factor, DVA assessed plaintiff's response to its IFN.  *See* AR Tab 189.  DVA concluded that plaintiff's proposal "contain[ed] major errors, omissions, or deficiencies that indicate[d] a lack of understanding of the problems or an approach that  [could] not be expected to meet requirements or involve[d] very high risk; and none of these conditions [could have been] corrected without a major rewrite or revision of the proposal."  AR Tab 189, at 78534.  In coming to this assessment, DVA stated that plaintiff's "[***]" demonstrated that plaintiff did not adequately understand the [***] as presented in the Solicitation.  AR Tab 189, at 78537.

Additionally, DVA stated that plaintiff included a table that "[***]."  AR Tab 189, at 78538.  The evaluation discussed this comparison, stating that for [***] of the labor categories, the lowest bid rate did not meet the [***].  *Id.*  The evaluation deemed plaintiff's explanation for this—that the "[***]"—unsatisfactory.  *See id.* (internal quotation marks omitted).

Also, DVA's evaluation report discussed plaintiff's labor rates and allocation of labor hours.  The report stated that plaintiff "allocated a [***] to team members that proposed the [***] within that labor category."  *Id.*  The report discussed plaintiff's explanation for this, which pointed to the [***].  *Id.*  DVA found it problematic that no additional justification was provided for the use of these rates and no assumptions regarding the subcontractors were revealed in the proposal.  *Id.*

Finally, the evaluation report stated that plaintiff's response to the IFN only discussed its plans to attract and retain a workforce for the prime contractor and neglected to do so for the subcontractors.  AR Tab 189, at 78539.  Because of that omission and other criticisms discussed above, DVA deemed the management sub-factor "[***]," specifically finding it deficient because of unrealistically low labor rates.  AR Tab 189, at 78540.  This meant that plaintiff received a total rating of "[***]" for the technical criterion, rendering it ineligible to receive an award under the Solicitation.

In view of the evaluation report, on March 16, 2011, plaintiff was informed that its proposal was being excluded from the final competitive range because it "[was] not one of the most highly rated proposals."  AR Tab 205, at 79115.  Pursuant to FAR 15.505, plaintiff requested a debriefing, which it received on March 29, 2011.  AR Tab 206, at 79117.  During the debriefing, DVA discussed the contents of its evaluation report with plaintiff and explained that, "[b]ased upon the results of the interim evaluation, the proposal . . . was rated [***] in the Technical Factor and Management Sub-Factor; and therefore, was no longer eligible for award."  AR Tab 206, at 79150.

F.      *Plaintiff's GAO Protests*

On April 1, 2011, plaintiff filed a bid protest with GAO. *See* AR Tab 207. The protest challenged DVA's evaluation of plaintiff's proposal on four grounds: (1) DVA was unreasonable and inconsistent with Solicitation requirements in its evaluation of plaintiff's proposal with respect to the management sub-factor; (2) DVA's evaluation of the SBPC factor in plaintiff's proposal was unreasonable; (3) DVA's analysis of plaintiff's response to the first sample task was unreasonable; and (4) DVA's unreasonable evaluation[8] prejudiced plaintiff. AR Tab 207.

On May 6, 2011, plaintiff filed a supplemental protest. *See* AR Tab 215. In its supplemental protest, plaintiff challenged the IGCE, arguing that it "was so tainted by such 'irrational assumptions and critical miscalculations' as to render it useless as the basis for determining a minimum acceptable labor rate and thereby unduly tainted the bidding process." AR Tab 215, at 79313. Additionally, plaintiff contended that the IGCE was unsupported and not adequately documented in the record. AR Tab 215, at 79326–27. Plaintiff also asserted that it was prejudiced by DVA's use of the IGCE. AR Tab 215, at 79327–28.

GAO denied both plaintiff's original and supplemental bid protests. *See* AR Tab 234. It found that (1) DVA's conclusion that plaintiff's labor rates were unrealistic was reasonable; (2) DVA's decision to "use small business prices for 30 percent of the prices used to calculate its average hourly rates" was appropriate given its procurement goals; (3) plaintiff did not adequately challenge the randomness of the contractor selection used to create the model labor rates; (4) DVA's evaluation of plaintiff's proposal, specifically with regard to the management sub-factor of the technical criterion, was consistent with the terms of the Solicitation; and (5) DVA properly considered plaintiff's explanation of its management proposal proffered during the discussion phase of the evaluation. AR Tab 234, at 82203.

G.      *Instant Action*

On July 7, 2011, plaintiff filed this action (docket entry 1). Defendant filed a motion to dismiss on July 14, 2011 (docket entry 11). Then, on July 18, 2011, plaintiff filed an amended complaint alleging that DVA had acted in a manner that was arbitrary, capricious, an abuse of discretion, and contrary to law in its evaluation of plaintiff's proposal, in its discussions with plaintiff about its proposal, and in its alleged violation of the automatic stay provision of the Competition in Contracting Act ("CICA").[9]

---

[8] Specifically, the protest argued that DVA's "unreasonable, incomplete, and unjustified price realism evaluation that led to an erroneous finding that DSCI's management proposal was [***]" prejudiced plaintiff because it resulted in its exclusion from the competitive range. AR Tab 207, at 79175. Plaintiff also argued that DVA was unreasonable when it assigned a rating of only "[***]" to plaintiff's treatment of the SBPC factor and its response to sample task one. AR Tab 207, at 79176.

[9] Defendant notes that plaintiff conceded that the issue of DVA's alleged violation of CICA "became moot when the [D]VA agreed to voluntarily stay the challenged action and, moreover, when [GAO] denied [the] bid protest [before GAO]." Def.'s Mot. for J. on AR 2 n.1. That also rendered defendant's motion to dismiss, which was based on the alleged CICA violation, moot.

Defendant produced the administrative record, consisting of over 82,206 pages, on August 5, 2011.  On August 23, 2011, plaintiff moved for judgment on the administrative record and requested injunctive relief.  Defendant filed a cross-motion for judgment on the administrative record on August 24, 2011.  Plaintiff and defendant each filed oppositions on September 6, 2011 (docket entry 60) and on September 9, 2011 (docket entry 64), respectively, and simultaneous replies on September 20, 2011 (docket entries 74–75).  CACI-ISS, Inc. filed an opposition to plaintiff's motion (docket entry 53, Sept. 2, 2011).  The Court held a hearing on the cross-motions on October 4, 2011.  At the parties' request, the Court rendered its decision from the bench.  *See* Oct. 4, 2011 Order (docket entry 83).  This Opinion and Order explains the Court's rationale in greater detail.

## II.   Analysis

The parties filed cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims.   In a bid protest action, the Court will set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4); *Banknote Corp. of Am. Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  The protestor will succeed when "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Banknote Corp. of Am.*, 365 F.3d at 1351 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)) (internal quotation marks omitted).  The protestor must show that the agency failed to provide a "coherent and reasonable explanation of its exercise of discretion" or that there was a "clear and prejudicial violation of applicable statutes or regulations."  *Id.*  (quoting *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1332–33) (internal quotation marks omitted).

The protestor's burden becomes more difficult the greater the degree of discretion vested in the contracting officer.  *DynCorp Int'l v. United States*, 76 Fed. Cl. 528, 537 (2007).  Negotiated procurements afford the contracting officer a "breadth of discretion"; "best-value" awards afford the contracting officer additional discretion.  *Id.*  Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy."  *Id.*

In reviewing cross-motions for judgment on the administrative record, the Court must determine "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  *A & D Fire Prot. v. United States*, 72 Fed. Cl. 126, 131 (2006).  In a manner "akin to an expedited trial on 'the paper record,'" the Court will make findings of fact where necessary.  *CHE Consulting, Inc. v. United States*, 78 Fed. Cl. 380, 387 (2007) (quoting *A & D Fire Prot. v. United States*, 72 Fed. Cl. at 131).

A.       *The Independent Government Cost Estimate Was Adequately Documented in Contemporaneous Records and Was Rational*

The parties agree that the management sub-factor of the technical factor of the Solicitation called for a price realism analysis.  *See* Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on AR 43 (citing AR Tab 3, at 252); Def.'s Mot. for J. on AR 13–14.  The FAR does not mandate any particular method of conducting a price realism analysis and "the nature and extent of a price realism analysis, as well as an assessment of potential risk associated with a proposed price, are generally within the sound exercise of the agency's discretion."  *Pemco Aeroplex, Inc.*, B-310372.3, 2008 WL 2684841, at *5 (Comp. Gen. June 13, 2008).  The agency's "discretion is even more pronounced when the Solicitation is silent regarding the methodology to be used in conducting a 'price realism analysis.'"  *Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70, 102 (2006); *PharmChem, Inc.*, B-291725.3 *et al.*, 2003 WL 21982424, at *6 (Comp. Gen. July 22, 2003) (explaining that price realism analysis can be reasonably conducted by "evaluat[ing] each line item and the total price for each proposal and compar[ing] them with [the] independent estimate and with other offerors' prices").  An agency's price realism analysis lacks a rational basis if the contracting agency made "irrational assumptions or critical miscalculations."  *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000).

1.       Contemporaneous Records are Sufficient to Demonstrate the Basis for the IGCE

 "[A]n IG[C]E need not be supported with exhaustive details . . . ."  *Nutech Laundry & Textile, Inc. v. United States*, 56 Fed. Cl. 588, 594 (2003).  Nonetheless, "the agency must be able to demonstrate the basis for the estimate."  *Id.*  In *Nutech*, the court found that the documentation of the IGCE was insufficient:

> The record contains a one-page IG[C]E that is completely lacking in any notes or back-up documentation.  It is accompanied neither by a description of cost figures upon which it is based nor the basis for arriving at the costs listed.  A page with numbers and lacking any references is not an adequate IG[C]E upon which to base a price decision.

*Id.*  In contrast, in a different case, the court found adequate a ten-page IGCE that was "extensive and detailed."  *Process Control Techs. v. United States*, 53 Fed. Cl. 71, 77 (2002).

Here, contemporaneous records relating to the IGCE identified a number of "assumptions" on which the IGCE was based.  *See* AR Tab 1, at 2–3.  The assumptions stated that applicable labor rates were developed based on "the simple average of a random sampling of 10 contractors' GSA Schedule 70 Government Site rates . . . discounted by twenty percent to simulate competition."  *Id.*  The sample included seven large business contractors and three small business contractors.  *Id.*  The assumptions stated that the IGCE did not develop separate labor rates for specific types of small businesses.  *Id.*  When a labor category was not represented in the ten contractors' rates, DVA used "judgment to select a 'best fit' GSA rate for the missing PWS categories."  *Id.*

Plaintiff has not disputed that DVA was permitted to use an IGCE in conducting its price realism analysis. *See* Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on AR 43–46. However, plaintiff has disputed the sufficiency of the contemporaneous documentation demonstrating the basis of the IGCE. *See id.* Plaintiff claims the records lack (1) the method employed to select the ten "random" contractors, (2) the names of the chosen ten contractors, (3) the actual calculation of the rates, (4) the identity of the specific rates that were developed by DVA's "judgment," (5) the significance in the IGCE of the rates calculated based on "judgment," (6) the method employed to calculate the rates based on "judgment," and (7) the comparison of the ten contractors' rates to the IGCE labor categories. *See* Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on AR 45–47; Pl.'s Reply to Def.'s Resp. to Mot. for J. on AR 2–5.

Although additional records would be helpful in understanding the development of the IGCE, additional records are not necessary to effectively review the development and application of the IGCE. *Cf. MED Trends, Inc. v. United States*, No. 11-420, 2011 WL 4037418, at *6 (Fed. Cl. Sept. 13, 2011) ("DOL prepared the IGCE 'using historical data from previous similar contracts.' The plaintiff has not demonstrated, or even alleged, that any of these particular figures were unreasonable or inaccurate. Nor has it pointed to any authority for the proposition that the agency must provide a more detailed explanation of how its IGCE was formulated.") (citation omitted). The records relating to the IGCE here are unlike those in *Nutech* where the IGCE was only supported by "[a] page with numbers and lacking any references." *Nutech Laundry & Textile, Inc.*, 56 Fed. Cl. at 594. In fact, in this case, the records' detail and length far surpass the records supporting the IGCE that the court deemed adequate in *Process Control Technologies*. *See Process Control Techs.*, 53 Fed. Cl. at 77. Accordingly, the Court finds that the contemporaneous documentation is sufficient to permit the Court to effectively review the creation and application of the IGCE, which, plaintiff contends, was based on irrational assumptions and critical miscalculations.

 2.  The IGCE Was Not Based on Irrational Assumptions or Critical Miscalculations

Although defendant's method is not the only one suitable for developing an IGCE, the Court is not persuaded that plaintiff's allegations are such as to justify the Court in setting aside the IGCE. *See* Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on AR 43–46; Pl.'s Reply to Def.'s Resp. to Mot. for J. on AR 2–4.

First, plaintiff points to the IGCE assumptions' silence with respect to the process by which DVA selected ten GSA Schedule 70 contractors for use in developing the IGCE. As an initial matter, the list of assumptions indicates that the rates were developed based on "the simple average of a random sampling" of ten contractors' GSA Schedule 70 Government Site rates. AR Tab 1, at 2–3. Moreover, records before GAO indicate that the pool consisted of 407 contractors who had expressed an interest in the procurement by attending an Industry Day event and that had previously performed similar IT-related tasks pursuant to GSA Schedule 70. *See* AR Tab 223, at 82161; AR Tab 227, at 82179; AR Tab 230, at 82185; AR Tab 233, at 82198. DVA's

process of creating the IGCE based on figures gathered from interested contractors that had performed similar IT-related tasks was reasonable.[10]

The Court's determination is based on records that are properly before it. In denying plaintiff's motion to strike some of the documents that were before GAO and portions of defendant's briefs relying on them, the Court explained that "to the extent that the [materials] contain post-hoc rationalizations of the agency's initial determination regarding plaintiff, the court will apply a high level of scrutiny when deciding the proper weight to afford such materials."[11]   Sept. 16, 2011 Order 3 (docket entry 70).

Here, the documents containing the agency's explanations to GAO regarding the IGCE—particularly that DVA used rates from contractors selected from a pool of 407 contractors who had expressed interest in the Solicitation, AR Tab 223, at 82161; AR Tab 227, at 82179; AR Tab 230, at 82185; AR Tab 233, at 82198—do not constitute post-hoc rationalizations. Rather, they constitute a further explanation of the process used by the agency. The Court may consider explanatory materials that do not offer new rationales for past decisions and that illuminate the methodology the agency employed in making its determination. *See CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 376 n.15 (2010) (noting that the D.C. Circuit has resolved the tension between the "notion that an agency cannot provide a new reason for a prior decision, but can provide further explanation for a decision already made" by invoking the principle that any new material should be "merely explanatory of the original record" (*quoting Envtl. Def. Fund v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981))) (internal quotation marks omitted); *cf.*

---

[10] Plaintiff also disputes whether the selection of the ten contractors was actually "random," as stated in the list of assumptions. At the hearing, plaintiff argued that a truly random sampling would not likely result in the selection of six of the fourteen largest government contracting firms in the United States. Hearing at 10:10:25, D&S Consultants, Inc. v. United States, No. 11-446 (Fed. Cl. Oct. 4, 2011). Defendant explained that the agency picked names off the list of 407 interested contractors and then assessed whether the chosen firms could meet the requirements of the Solicitation. Hearing at 11:15:39, D&S Consultants, Inc. v. United States, No. 11-446 (Fed. Cl. Oct. 4, 2011). If they could, they were then included in the sample. *See id.* An agency statement to GAO described the selections as random, but stated that they were made *manually*. AR Tab 226, at 82178. Although the agency used the term "random" to describe its selection process, the process was, in fact, not purely random. Regardless, it was not required that the contracting officer select contractors at random to create the IGCE; in fact, there is no mandated method for creating an IGCE. Accordingly, that the selection of contractors whose labor rates were used to arrive at the IGCE in this case was not the result of a purely random selection process does not affect the Court's finding that the selection process that was employed by DVA was reasonable.

[11] A post-hoc rationalization is "a new rationale for an old decision." CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 377 (2010). When an administrative record contains such rationalizations, the court should view these with skepticism because "allowing [a post-hoc rationalization] to act as a gap filler . . . would frustrate effective judicial review under the APA standards." Id.

*CRAssociates, Inc.,* 95 Fed. Cl. at 377 (criticizing post-hoc rationalizations that amount to "a new rationale for an old decision").

Here, the contracting officer was under no obligation to provide "exhaustive detail" in support of the IGCE. *See Nutech Laundry & Textile, Inc.*, 56 Fed. Cl. at 594. During plaintiff's GAO protest, counsel for GAO submitted a number of questions to DVA regarding the creation and application of DVA's IGCE. *See* AR Tabs 222, 224, 229, 233. In response, DVA described its selection of ten contractors from the 407 that initially expressed interest in the Solicitation. *See* AR Tabs 223, 226–27, 230, 233. DVA's responses constitute further explanations of the rationale for the DVA's earlier decision to exclude plaintiff from the competitive range.

The record before the agency at the time it made its decision supports the conclusion that DVA's statements constitute *further* explanations, rather than post-hoc rationalizations. The pre-Solicitation documents contain details regarding the contractors that expressed interest in the T4 Program contract, the pool from which the agency selected ten contractors to develop the IGCE. *See* AR Tab 2.11. Accordingly, the contemporaneous record supports the agency's rationale. The agency's explanations before GAO of the process used to create the IGCE have been viewed by the Court with the required skepticism. Having done so, the Court finds DVA's statements to be further explanations of the original record. Thus, they are properly considered by this Court in determining that the IGCE was rational.

In support of its contention that the IGCE was rational as applied, defendant explains that the labor rates reflected in the IGCE, which were already reduced by twenty percent to simulate competition, were reduced by an additional fifty percent. Def.'s Resp. to Pl.'s Mot. for J. on AR 20–21, 25; *see* Def.'s Mot. for J. on AR 5–6, 17; AR Tab 217, at 79373. The final reduced rates were then used by the agency to determine which proposed labor rates were unrealistically low. AR Tab 208, at 79288–89; AR Tab 217, at 79373. Any labor rate proposed by an offeror that fell below the figure representing a fifty-percent reduction from the already reduced IGCE rate was deemed to be unrealistically low. AR Tab 217, at 79373.[12] This quite lenient method of applying the IGCE further demonstrates that the agency acted rationally in creating and applying the IGCE.

Plaintiff also argues that there is a flaw in the IGCE because DVA did not develop separate rates for evaluating specific types of businesses, such as small businesses. The IGCE

---

[12] For the same reasons that the Court can properly consider the agency's explanation before GAO of the creation of the IGCE, *see supra* Part II.A.2, the Court can properly consider its explanation of the IGCE's application to the offerors' proposals. As with the explanation concerning the pool of contractors, the record that was before the agency includes documentation that demonstrates that the IGCE rates as reduced by twenty percent and then by an additional fifty percent were compared to the offerors' rates to determine which were unrealistically low. *Compare, e.g.*, AR Tab 144, at 41766, *with* AR Tab 1, at 4. Accordingly, the agency's description of the process by which it compared offerors' rates with the IGCE rates was a clarification of a decision already reflected in the record. *See CRAssociates, Inc.*, 95 Fed. Cl. at 376 n.15. Therefore, the Court has properly considered that clarification in its evaluation of plaintiff's challenge to DVA's decision to exclude plaintiff from the competitive range.

also did not account for the geographic locations of the prime contractor and subcontractors. However, the ten contractors included three small businesses.  Moreover, as noted by defendant, plaintiff had the opportunity to provide specific information about their subcontractors, such as their location, but failed to do so.  Def.'s Resp. to Pl.'s Mot. for J. on AR 21–22.

Finally, plaintiff takes issue with the use of labor rates based on the "judgment" of DVA as to the "best fit" when selecting labor rates for categories not represented in the sampled firms. Plaintiff argues that the assumptions do not provide "additional insight into how DVA went about creating those rates, the number of rates that fit that category, or the significance of those rates in assessing DSCI's and other offeror's labor rates."  Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on AR 46.  However, the record before GAO indicates that DVA acted rationally when it exercised its judgment to find a "best fit" when the rates of the ten contractors did not include certain IGCE labor categories.  *See* AR Tabs 223, 233.  DVA explained that it divided the 167 labor categories in the IGCE into "functional" categories, and then analyzed the sampled firms to locate "an equivalent or closely equivalent labor category under the appropriate functional category."  AR Tab 223, at 82161.

Accordingly, the Court finds plaintiff's challenge to the creation and application of the IGCE unpersuasive.

B.   *DVA's Evaluation of Plaintiff's Management Proposal Considered Plaintiff's Management "Techniques and Controls" to Recruit and Retain the Required Workforce and Reasonably Found Them to be Inadequate*

Pursuant to the management sub-factor of the technical factor described in the RFP, DVA was to evaluate "whether the offeror's management techniques and controls and team [would] meet the [PWS] requirements and whether the proposal provide[d] the Government with a high level of confidence of successful performance."  AR Tab 3, at 252.  The Solicitation provided:

The Government may evaluate the offeror's proposed labor rates to determine if the proposed rates are unrealistically low in order to assess the ability of the offeror to meet the PWS requirements and whether the proposal provides the Government with a high level of confidence of successful performance. Unrealistically low labor rates may indicate a high-risk approach to contract performance.

*Id.*

In its evaluation, DVA determined that plaintiff's management proposal was deficient and issued an IFN:

You have described your approach to attracting and retaining your workforce, yet you have proposed unrealistically low labor rates for a substantial quantity of the total labor hours proposed.  This presents a very high degree of risk for attracting and retaining the workforce required to perform all functional areas of the Performance Work Statement.

. . .
>  Please review this worksheet and demonstrate in detail how you will attract and
>  retain the workforce necessary to perform all functional areas of the T4 PWS.

AR Tab 144, at 41808.  In its subsequent interim evaluation report, DVA addressed plaintiff's
management techniques and controls to recruit and retain the required workforce at the
subcontractor level:

>  The IFN response provided no additional insight or information into its [***]
>  subcontractors mechanisms [sic] that propose to account for [***]% of the work
>  under the contract. The Government determined that due to the low rates
>  proposed for the subcontractors, the Government has low confidence in the
>  offeror's ability to attract and retain employees at the subcontractor level, making
>  this a very high risk approach.

AR Tab 189, at 78539.  Thus, despite plaintiff's argument to the contrary, *see* Mem. of P. & A.
in Supp. of Pl.'s Mot. for J. on AR 30–33; Pl.'s Resp. to Def.'s Mot. for J. on AR 18–20; Pl.'s
Reply to Def.'s Resp. to Mot. for J. on AR 13–16, DVA did consider plaintiff's techniques and
controls to recruit and retain the required workforce and found them inadequate.  Accordingly,
the Court rejects plaintiff's claim that DVA did not consider its techniques and controls.

>  C.  *DVA Evaluated Plaintiff's Management Proposal in Accordance with the
>  Solicitation's Evaluation Criteria and Did Not Add a New, Unstated
>  Determinative Criterion*

"The law requires that evaluation factors and significant subfactors be clearly stated in an
RFP . . . ."  *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 652 (2003) (citing 41 U.S.C.
§ 253a(b)(1); FAR 15.304(d)).  "[M]aking offerors aware of the rules of the game in which they
seek to participate is fundamental to fairness and open competition."  *Id.* (quoting *Dubinsky v.
United States*, 43 Fed. Cl. 243, 259 (1999)) (internal quotation marks omitted).

Section M of the Solicitation did not expressly state that DVA would consider the
apportionment of hours between the prime contractor and subcontractors.  Nonetheless,
consideration of the number of hours to be worked by the prime and its subs was fairly implied
by the statement in the RFP that "[t]he Government may evaluate the offeror's proposed labor
rates to determine if the proposed rates are unrealistically low in order to assess the ability of the
offeror to meet the PWS requirements and whether the proposal provides the Government with a
high level of confidence of successful performance."  AR Tab 3, at 252.  In addition, section L
instructed plaintiff to address its approach to assigning work between the prime and its
subcontractors in completing its management proposal and to indicate "[t]he percentage of work
based on hours to be accomplished by the prime and proposed subcontractors."  AR Tab 3, at
239–40.  Section L "cautioned" plaintiff in completing its price proposal "to ensure that the
allocation of work among the prime contractor and the subcontractors indicated in the Price
proposal corresponds to the distribution of work indicated in the Management proposal."  AR
Tab 3, at 247.  Consistent with the Solicitation, the IFN regarding plaintiff's management
proposal stated that plaintiff had proposed a substantial number of hours to be performed at

unrealistically low labor rates.  AR Tab 144, at 41808.  Thus, the apportionment of hours was not a new, unstated determinative criterion; plaintiff was aware of it both from the Solicitation and the IFN.

Moreover, when conducting a price realism analysis, "the nature and extent of . . . [that] analysis is ultimately within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation."  *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 358 (2009).  Here, because the agency did not commit itself to a particular evaluation methodology in the Solicitation, it was entitled to exercise broad discretion with regard to how to conduct its analysis.  It was well within DVA's discretion to consider allocation of hours when conducting its price realism analysis.  That the agency would consider the allocation of hours was not only adequately disclosed in the Solicitation, but was also within the scope of the agency's discretion in conducting its price realism analysis.

Plaintiff relies heavily on a comparison between the pre-Solicitation documents and the actual Solicitation.  In the pre-Solicitation documents, (1) DVA stated that it would consider the realism of the allocation of hours and labor categories under the *sample tasks sub-factor* of the technical factor and (2) DVA did *not* state that it would consider the realism of labor rates *or* allocation of hours under the *management sub-factor* of the technical factor.  *See* D&S's Resp. to Def.'s Mot. for Leave to Amend & Correct AR 8–10 (docket entry 79, Sept. 28, 2011) (citing AR Tab 2.5, at 152.078, 152.080); *see also* Hearing at 10:30:37, D&S Consultants, Inc. v. United States, No 11-446 (Fed. Cl. Oct. 4, 2011).  The Court is not persuaded that the pre-Solicitation documents show that DVA added a new, unstated determinative criterion after receipt of proposals.

D.    *Plaintiff's Apportionment of Hours Was Rationally Related to Plaintiff's Ability to Recruit and Retain the Required Workforce*

Plaintiff argues that its apportionment of hours was unrelated to any defined scope and did not reflect its understanding of or approach to the technical requirements.  Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on AR 35–37.  Plaintiff argues that the Solicitation "furnished no specific scope of requirements for the offeror to consider in the development of the allocation of hours" and that plaintiff's apportionment was based on [***].  *Id.* at 36.

However, the Solicitation was sufficiently specific to make consideration of plaintiff's apportionment of hours rationally related to plaintiff's ability to recruit and retain a sufficient workforce when the apportionment of hours was viewed in conjunction with the proposed labor rates.  Section L instructed the offerors to indicate the percentage of hours to be performed by prime and subcontractors "by cross referencing technical functional area paragraphs 4.1 through 4.11 within the technical requirements cited in the PWS."  AR Tab 3, at 240.  The Solicitation also described the labor categories and the estimated number of hours that it would take to complete the PWS.  *See* AR Tab 3, at 265–395.  Section L, regarding the price proposal, stated that "[t]he apportionment of hours should reflect a realistic assessment of each team member's expected participation/contribution to the effort" and that the apportionment of hours in the price proposal should be consistent with the apportionment of hours in the management proposal.  AR Tab 3, at 247.  Accordingly, the Court finds that plaintiff's claim that its apportionment of hours

was not rationally related to its ability to recruit and retain the required workforce to be unpersuasive.

  E. *DVA's Determination That Plaintiff Would Have Difficulty Recruiting and Retaining an Adequate Workforce Was Not Inconsistent with the Remainder of the Evaluation*

  Plaintiff argues that DVA's determination that plaintiff would have difficulty recruiting and retaining a workforce was inconsistent with the remainder of the evaluation in a number of respects.  *See* Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on AR 37–39.

  First, plaintiff argues that DVA failed to consider plaintiff's controls and techniques that might mitigate risk relating to recruitment and retention.  However, as noted above, DVA did consider plaintiff's controls and techniques, and it found that plaintiff failed to provide sufficient specificity as to how its subcontractors would recruit and retain the required workforce.

  Second, plaintiff argues that DVA's finding under the past performance factor that plaintiff presented a "low risk" is inconsistent with DVA's finding with respect to recruiting and retaining a workforce.  In its argument, plaintiff relies on a GAO decision, *Joint Venture Penauille/BMAR & Associates,* B–311200 *et al.*, 2008 WL 2686507 (Comp. Gen. May 12, 2008).  In that decision, GAO dismissed in a footnote the source selection board's statement that the "weakness in [the protestor's] price reasonableness suggests a lack of understanding of the [s]olicitation requirements."  *Id.* at *6 n.8 (second alteration in original) (quoting source selection board's decision) (internal quotation marks omitted).  GAO relied on the selection board's failure to provide further explanation for the conclusion and to "reconcile this conclusion with other statements it made with regard to the technical evaluation, such as: [the offeror] 'successfully demonstrated a good understanding of the requirements,' 'present[ed] a technical approach and capabilities that exceed[ed] the solicitation performance and capability standards,' and presented an 'overall low degree of risk in meeting the Government's requirements.'"  *Id.* (last two alterations in original).  Here, unlike in *Joint Venture Penauille*, DVA rationally and thoroughly explained its finding with respect to difficulty in recruiting and retaining an adequate workforce.  That plaintiff was rated a "low risk" under the past performance factor is not inconsistent with the conclusion that plaintiff would have difficulty recruiting and retaining the required workforce.

  Third, plaintiff argues that DVA's finding that plaintiff would have difficulty recruiting and retaining an adequate workforce is inconsistent with DVA's findings incident to its evaluation of the management proposal, such as a finding of strength for forecasting and controlling costs and assigning work between itself and its subcontractors.  Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on AR 38–39; *see* AR Tab 189, at 78539–40.  However, these findings are not inconsistent with DVA's conclusion that plaintiff would have difficulty recruiting and retaining an adequate workforce.

  Accordingly, the Court rejects plaintiff's claim that DVA's finding with respect to plaintiff's ability to recruit and retain an adequate workforce was irrational and inconsistent with its "low risk" rating with respect to past performance.

F.      *DVA's Discussions with Plaintiff Were Not Misleading or Inadequate*

Plaintiff next alleges that it is entitled to judgment on the administrative record because DVA conducted discussions with plaintiff that were misleading and inadequate.  Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on AR 39–41.  Specifically, plaintiff claims that DVA did not apprise plaintiff of its concerns regarding plaintiff's allocation of labor hours and the way in which it mapped labor categories to the SCA.  *Id.* at 40–41.

Under FAR Part 15, when conducting discussions "the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond."[13]  FAR 15.306(d)(3).  Despite this obligation, the FAR states that the contracting officer "is not required to discuss every area where the proposal could be improved" and explains that the contracting officer has considerable discretion regarding the contents of the discussions.  *Id.*; *see Advanced Data Concepts, Inc. v. United States*, 43 Fed. Cl. 410, 422 (1999) ("The contracting officer has broad discretion in conducting discussions."), *aff'd*, 216 F.3d 1054 (Fed. Cir. 2000).

For discussions to be meaningful, and therefore adequate,[14] they must "generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit."  *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 384 (2003) (quoting *WorldTravelService v. United States,* 49 Fed. Cl. 431, 439 (2001)), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).  Although discussions must be specific, the procuring agency is not required "to address in express detail all inferior or inadequate aspects of a proposal."  *Id.* (quoting *Labat-Anderson, Inc. v. United States,* 42 Fed. Cl. 806, 835 (1999)) (internal quotation marks omitted); *see also WorldTravelService,* 49 Fed. Cl. at 439–40 (noting that meaningfulness "does not mean that an agency must 'spoon-feed' an offeror as to each and every item that must be revised, added, or otherwise addressed to improve a proposal" (quoting *LaBarge Elecs.*, B-266210, 1996 WL 53930, at *5 (Comp. Gen. Feb. 9, 1966))) (internal quotation marks omitted).

Here, as required by FAR 15.306(d)(3), defendant conducted discussions with each of the twenty-two offerors included in the competitive range.  *See* AR Tabs 136–57.  In doing so, it submitted seven IFNs to plaintiff identifying concerns with plaintiff's proposal and requesting plaintiff's response.  *See* AR Tab 144.  In accordance with the FAR, the IFNs explicitly noted

---

[13] Additionally, the FAR "encourage[s]" contracting officers to include in their discussions other aspects of a proposal at issue that could, if amended or explained, increase the likelihood that the proposal will result in an award.  FAR 15.306(d)(3).

[14] Although plaintiff frames its challenge as one of "inadequacy," both parties discuss the duty the FAR imposes on the contracting officer in terms of "meaningfulness."  *See* Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on the AR 39–40; Def.'s Mot. for J. on AR 25.  Additionally, case law makes clear that it is appropriate to apply the meaningfulness standard where a plaintiff alleges that discussions were inadequate.  *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 384–85 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

concerns about past performance and specific weaknesses and deficiencies in plaintiff's proposal. *See id.*; FAR 15.306(d)(3). As discussed, one IFN reported a deficiency because plaintiff proposed "unrealistically low labor rates for a substantial quantity of the total labor hours proposed." AR Tab 144, at 41808. Additionally, the IFN included a worksheet that specifically identified the hourly rates defendant considered unrealistically low. AR Tab 144, at 41766–807.

Although the IFN did not specifically identify problems with plaintiff's allocation of hours and SCA mapping, both issues ultimately affected the overall price and various labor rates. Therefore, that the IFN directed plaintiff to concerns about its labor rates was enough to "lead" it to the area of its proposal encompassing those issues. *See Banknote Corp. of Am., Inc.*, 56 Fed. Cl. at 384. The contracting officer was under no obligation to specifically notify plaintiff that the problems with its allocation of hours and SCA mapping could potentially cause DVA to eliminate plaintiff from the competitive range. *See id.*; *see also Structural Assocs., Inc. v. United States*, 89 Fed. Cl. 735, 743 (2009) ("[D]iscussions . . . are designed to point out shortcomings in an offeror's proposal as judged from the standpoint of the government's stated needs, rather than from the standpoint of the proposal's relative competitiveness."). By apprising plaintiff of deficiencies and weaknesses in its proposal, the contracting officer properly used her discretion and fulfilled her obligations under the FAR. *See* FAR 15.306(d)(3). Therefore, DVA's discussions with plaintiff were meaningful and complied with the requirements of the FAR. *See PHT Supply Corp. v. United States*, 71 Fed. Cl. 1, 22–23 (2006) (explaining that compliance with the FAR's provisions constitutes a meaningful discussion).

Nonetheless, plaintiff claims that the discussions were misleading. Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on AR 40. Discussions are misleading if they "misdirect the protestor as it revises its proposal." *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 670 (2010). Misleading discussions consist of "communications from the government that are incorrect, confusing[,] or ambiguous." *Id.* In submitting questions during discussions, an agency is not permitted to mislead an offeror "into responding in a manner that does not address the agency's concerns; or that misinforms the offeror concerning its proposal weaknesses or deficiencies." *Analytical & Res. Tech., Inc. v. United States*, 39 Fed. Cl. 34, 48 (1997) (quoting *SRS Techs.*, B-254425, *et al.*, 1994 WL 576118, at *3 (Comp. Gen. Sept. 14, 1994)). However, this standard does not mean that "discussions must address all aspects of a proposal that are less than optimal." *DMS All-Star Joint Venture*, 90 Fed. Cl. at 670.

In this case, defendant's discussions with plaintiff were not misleading. Defendant clearly notified plaintiff of the shortcomings in its proposal, *see* AR Tab 144, and highlighted the specific labor rates with which it was particularly concerned. AR Tab 144, at 41766–807. Doing so had the effect of directing plaintiff to respond to defendant's concerns over unrealistically low labor rates, *see* AR Tab 167, at 60776–825, rates that were created using SCA mapping, *see* AR Tab 13, at 14564–66, and that resulted from plaintiff's allocation of hours. *See* AR Tab 13, at 14575–15800. The contracting officer was under no obligation to specifically point out each concern with plaintiff's proposed labor rates. *See* FAR 15.306(d)(3); *DMS All-Star Joint Venture*, 90 Fed. Cl. at 670. Moreover, nothing in the record suggests that the contracting officer provided incorrect, confusing, or ambiguous information or instructions. Plaintiff, experienced in government contracting, should have been familiar with IFNs and the

duties of contracting officers. That plaintiff failed to address SCA mapping and allocation of hours in its response was not a result of misleading discussions. Accordingly, the Court concludes that plaintiff has failed to establish that the agency's discussions were inadequate and misleading.

G.    *DVA's Discussions with the Offerors Were Not Unequal*

Plaintiff next alleges that it is entitled to judgment on the administrative record because DVA held unequal discussions with the various offerors included in the initial competitive range. Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on AR 42–43. Specifically, plaintiff argues that DVA did not apprise plaintiff of the problem associated with plaintiff's allocation of hours, but that it notified another offeror of this very concern. *Id*. This, according to plaintiff, resulted in unequal discussions in violation of the FAR and other government contracting principles. *See id.*

Under FAR Part 15, the government "shall not engage in conduct that . . . [f]avors one offeror over another." FAR 15.306(e)(1). Thus, discussions between the government and each of the offerors must be equal. *Ashbritt, Inc. v. United States*, 87 Fed. Cl. 344, 372 (2009) (noting, for example, that "[t]he Government may not inform some offerors of a concern with their pricing level while staying silent with respect to identical issues in other offerors' proposals"). An "advantageous piece of information" may not be disclosed to only some offerors being considered for an award. *Kerr Contractors, Inc. v. United States*, 89 Fed. Cl. 312, 329 (2009). However, "agencies are not required to conduct identical discussions with each offeror." *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 735 (2008) (citing *WorldTravelService,* 49 Fed. Cl. at 440). Instead, discussions are to be conducted in a manner that addresses the specifics of each individual offeror's proposal. *WorldTravelService,* 49 Fed. Cl. at 440.

Plaintiff argues that defendant's IFN to offeror 1 addressed the issue of allocation of hours and thereby prompted that offeror to respond with a properly amended proposal.[15] Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on AR 42–43. The IFN to offeror 1 notified it that its "proposal did not provide a clear approach to assigning work between [it] and any of [its] proposed subcontractors." AR Tab 136, at 41437. However, the concern regarding offeror 1 was not the proposed allocation of hours between it and its subcontractors, but rather the lack of a clear *plan* governing how offeror 1 intended to assign hours among its subcontractors. *See id.* In its interim evaluation report regarding plaintiff's proposal, defendant expressed a concern about plaintiff's allocation of hours, *see* AR Tab 189, at 78538–40, not about the insufficiency or omission of plaintiff's planned approach to making the allocation. Plaintiff, in fact, described a plan it had in place.[16] *See* AR Tab 13, at 15806. It was in part plaintiff's proposed allocation of hours that resulted in the deficiency that caused plaintiff to be excluded from the competitive

---

[15] Offeror 1 was subsequently included in the final competitive range from which plaintiff was excluded. *See* AR Tab 205, at 79115; AR Tab 204, at 79112–13.

[16] Defendant recognized plaintiff's proposed plan as a strength in its evaluation report and stated, "The offeror provided adequate detail in its approach for assigning work between the prime and its subcontractors." AR Tab 189, at 78539 (emphasis omitted).

range.  AR Tab 189, at 78540.  However, the discussions were both equal and sufficient to direct plaintiff's attention to the agency's concerns related to allocation of hours.

Although defendant raised the issue of allocation of hours in its discussion with offeror 1, *see* AR Tab 136, at 41437,  it did so in a way that was tailored to the specific concern it had with offeror 1's proposal.  An absence of a proposed approach to labor hours allocation is an issue distinct from improper assignment of hours that results in unrealistically low labor rates. Accordingly, the record does not support plaintiff's contention that defendant treated offerors unequally when conducting discussions.

## CONCLUSION

In view of the foregoing, the Court **GRANTS** defendant's motion for judgment on the administrative record and **DENIES** plaintiff's motion for judgment on the administrative record. Defendant's motion to dismiss is **DENIED** as moot.  The Clerk is instructed to enter judgment accordingly.

Some information contained herein may be considered protected information subject to the protective order entered in this action on August 5, 2011 (docket entry 24).  This Opinion and Order shall therefore be filed under seal.  The parties shall review the Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the protective order prior to publication.  The Court **FURTHER ORDERS** that the parties shall file, by **October 24, 2011**, a joint status report identifying the information, if any, they contend should be redacted, together with an explanation of the basis for each proposed redaction.

**IT IS SO ORDERED.**


_____ s/ George W. Miller _____
GEORGE W. MILLER
Judge